**MILBERG COLEMAN BRYSON PHILLIPS**
**GROSSMAN, PLLC**
John J. Nelson (SBN 3175985)
402 W. Broadway, Suite 1760
San Diego, CA 92101
858-209-6941
jnelson@milberg.com

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff*
305 Broadway, 7ᵗʰ Floor
New York, New York 10007
Tel:    914-775-8862
jbm@wittelslaw.com

*Motion for pro hac vice admission forthcoming*

[NAMES AND ADDRESSES OF ADDITIONAL
COUNSEL APPEAR ON SIGNATURE PAGE]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JORDAN ZEICHNER,**<br><br>On Behalf of Himself and All Others Similarly Situated,<br><br>**Plaintiff,**<br><br>**v.**<br><br>**NORDSEC LTD., NORDSEC B.V., NORDVPN S.A., NORD SECURITY INC., and TEFINCOM S.A. d/b/a NordVPN,**<br><br>**Defendants.** | Case No.: 3:24-cv-2462<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jordan Zeichner ("Plaintiff"), by his undersigned attorneys, Milberg Coleman Bryson Phillips Grossman, PLLC and Wittels McInturff Palikovic, brings this consumer protection action in his individual capacities and on behalf of a class of consumers defined below against Defendants NordSec Ltd., NordSec B.V., Nordvpn S.A., Nord Security Inc., and Tefincom S.A. d/b/a NordVPN (hereafter, "Defendants," "NordSec," or the "Company") and hereby alleges the following with knowledge as to his own acts and upon information and belief as to all other acts:

## INTRODUCTION

1.      This is a proposed class action lawsuit challenging NordSec's use of deceptive and illegal "automatic renewal" practices to dupe consumers into paying for unwanted, pricey subscriptions to NordSec's virtual private network and other services, which subscriptions NordSec intentionally makes difficult to cancel.

2.      Defendants offer a suite of products and services to consumers that are intended to provide subscribers with privacy and protection from cybersecurity threats while using the internet. Those offerings include a VPN service called "NordVPN," a password manager called "NordPass," and an encrypted cloud storage service called "NordLocker."

3.      Members of the public are directed to NordSec's website through online searches or by advertising for the Company's VPN and/or other consumer services.  NordSec advertises widely online and on dozens of podcasts.  NordSec's advertising touts the benefits that enrolling in its products and services allegedly offers the prudent consumer; for example, the Company claims that its VPN service provides consumers "safe and private access to the internet" and that it is "trusted by tech experts and users."

4.      While consumers sign up for NordSec's privacy and security products and services with the intent of protecting their information online, unbeknownst to these consumers NordSec is actually collecting consumers' payment information for use in its illegal and deceptive autorenewal scheme.

5.      NordSec's subscription enrollment and cancellation process is deceptive and violates the California automatic renewal law because it fails to clearly and conspicuously disclose in temporal proximity the terms of the automatic renewal before consumers purchase a NordSec subscription, fails to obtain consumers' affirmative consent to automatic renewal of a NordSec subscription, fails to

provide an acknowledgment that includes NordSec's automatic renewal terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, fails to provide a cost-effective, timely, and easy-to-use mechanism for cancellation, fails to provide adequate notice to consumers at least 15 days and not more than 45 days that the NordSec subscription will automatically renew unless the consumer cancels the subscription, and fails to provide customers clear and conspicuous notice of material changes to NordSec's automatic renewal terms along with information regarding how to cancel the subscription in a matter that is capable of being retained by the consumer.

6.      NordSec's subscription has a "negative option" renewal policy, which means the subscription regularly renews unless consumers take affirmative steps to cancel. Due to NordSec's negative option renewal policy, many consumers who purchase a NordSec product or service ultimately end up paying fees for a NordSec subscription that they do not want.

7.      Once a consumer signs up with NordSec, the Company employs a number of strategies designed to ensure the consumer does not stop paying for its products. These deceptive design practices aim to manipulate users into taking certain actions and exploit known frailties in human cognitive processing are known as "dark patterns."

8.      For example, canceling a NordSec subscription is made exceedingly difficult and requires a consumer to figure out—with no help from the Company—how to navigate NordSec's account settings to bring their recurring payments to a halt.

9.      To protect California consumers from deceptive autorenewal practices such as these, California enacted its automatic renewal law (the "ARL") to protect consumers from deceptive autorenewal practices like those of Defendants. BUS. & PROF. CODE §§ 176000–06 (the "ARL"). The ARL requires companies employing automatic renewal payment mechanisms to provide "clear and conspicuous" disclosures about the autorenewal plan, obtain consumers' "affirmative consent" to autorenewal, provide a "cost-effective, timely, and easy-to-use mechanism" for cancelling the subscription, notify customers that their subscription will renew 15 to 45 days before it does, and clearly and conspicuously notify consumers about material changes to automatic renewal terms.

10.     Defendants are well aware that their scheme is deceptive and unlawful, as complaints about NordSec are legion, with hundreds of consumers complaining on sites like Trustpilot, SiteJabber, and Reddit or directly to NordSec.

11.     Nevertheless, NordSec continues to subject members of the public to its unlawful autorenewal scheme and Defendants continue to reap significant monetary benefits from it.

12.     Only through a class action can consumers remedy Defendants' unlawful practices. Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge NordSec's improper conduct, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Furthermore, many customers do not realize they are victims of NordSec's unlawful acts and continue to be charged to this day.  With this class action, Plaintiff and the Class seek to level the playing field, enjoin NordSec's unlawful business practices, and recover the charges NordSec has imposed on Plaintiff and the Class in violation of the law.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over Defendants because they conduct substantial business in California, have sufficient minimum contacts with this state, and otherwise purposely avail themselves of the privileges of conducting business in California by marketing and selling products and services in California.  Further, the injuries to California consumers that Plaintiff seeks to prevent through public injunctive relief arise directly from NordSec's continuing conduct in California, including, but not limited to, directing its auto-enrollment and renewal practices at California consumers.

14.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendants.

15.     This Court has original subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act.  However, if the Court determines that it lacks original jurisdiction over any claim in this action, it may exercise supplemental jurisdiction over Plaintiff's claims under 28

3

U.S.C. § 1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged improper conduct occurred within this District, as Plaintiff resides in this District, and Defendants reside in this District for venue purposes.  *Id.* § 1391(c)(2).

## **PARTIES**

17.     Plaintiff Jordan Zeichner is a citizen of California and lives in San Francisco, California. He enrolled in a NordSec subscription on or around October 30, 2019.

18.     Plaintiff is a consumer who was victimized by NordSec's unlawful autorenewal practices, suffered injury in fact, and lost money because of NordSec's violations of California consumer protection statutes.

19.     Defendant NordSec Ltd. is an internet privacy and security company headquartered in Vilnius, Lithuania.

20.     Defendant NordSec B.V. is an internet privacy and security company headquartered in Vilnius, Lithuania.

21.     Defendant Nordvpn S.A. is a Panamanian corporation incorporated under the laws of Panama.  Nordvpn S.A.'s principal place of business is in Panama City, Panama.

22.     Defendant Nord Security Inc. is a Delaware corporation.

23.     Defendant Tefincom S.A. d/b/a NordVPN is a Panamanian corporation incorporated under the laws of Panama.  Tefincom S.A.'s principal place of business is PH F&F Tower, 50th Street and 56th Street, Suite #32-D, Floor 32, Panama City, Panama.  Defendant Tefincom S.A. owns and controls Defendants NordSec Ltd. and NordSec B.V. and owns the trademark for "NordVPN."

24.     Upon information and belief, with respect to all actions and decisions to this action, Defendants have operated as a single entity, "Nord Security."

25.     Defendants held themselves out to the public, including Plaintiff, as if each entity were operating as a single entity.

26.     Upon information and belief, at all times pertinent to this action, the finances, policies, and business practices of Defendants are and were dominated and controlled by one another in such a

manner that each individual Defendant has no separate mind, will, identity, or existence of its own and instead operated as mere instrumentalities and alter egos of one another.

27.     Upon information and belief, Defendants are so closely related in ownership and management, and that each works closely in concert with the other, such that each has become the alter ego of the other, in that, among others:

a.  Defendants operate and hold themselves out to the public as a single entity.

b.  Defendants operate and hold themselves out to the public in such a way that members of the public would be unable to identify and distinguish between one entity and another.

28.     When Defendants issue news releases about NordSec's activities, they do so under the NordVPN brand and include contact information of various NordSec employees with nordsec.com email addresses.

29.     Any such conduct of one Defendant should be imputed to each other Defendant.

## FACTUAL ALLEGATIONS

### A.     Background on the Subscription e-Commerce Industry

30.     The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[1]  Subscription e-commerce services target a wide range of customers and cater to a variety of specific interests.  Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[2] According to the Washington Post, analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[3]

---

[1] *See* Sam Saltis, CORE DNA, How to Run an eCommerce Subscription Service: The Ultimate Guide, https://www.coredna.com/blogs/ecommerce-subscription-services.

[2] Mary Mesienzahl, BUSINESS INSIDER, Taco Bell's taco subscription is rolling out nationwide — here's how to get it, Jan. 6, 2022, https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[3] Heather Long and Andrew Van Dam, WASHINGTON POST, Everything's becoming a subscription, and

31.     The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  "Over the past 11 years, subscription-based companies[] have grown 3.7x faster than the companies in the S&P 500."[4]

32.     The expansion of the subscription e-commerce market shows no signs of slowing. According to The Washington Post, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] . . .  The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[5]

33.     However, there are downsides associated with the subscription-based business model. While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[6]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[7] Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[8]  As these companies have realized, "[t]he real money

---

the pandemic is partly to blame, June 1, 2021,
https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/.

[4] The Subscription Economy INDEX, ZUORA, Mar. 2023,
https://www.zuora.com/resources/subscription-economy-index/.

[5] Heather Long and Andrew Van Dam, *supra* note 3.

[6] McKinsey & Company, Thinking inside the subscription box: New research on e-commerce consumers, February 2018, https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[7] *Id.*

[8] Amrita Jayakumar, WASHINGTON POST, Little-box retailing: Subscription services offer new possibilities to consumers, major outlets, Apr. 7, 2014, https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-  8d62-419db477a0e6_story.html.

is in the inertia."[9]  As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[10]  That is, to facilitate consumer inertia, some subscription e-commerce companies, including Defendants, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans.  They do this by intentionally confusing users with their app's design and flow, … and other misleading tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs.[11]

34.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[12]  Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[13]  Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts [and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[14] widespread utilization of these misleading dark patterns and deliberate omissions persist.

35.     The term "dark patterns" in this Complaint is not a science fiction reference, but a term of art from the field of user experience ("UX").  The International Organization for Standardization (ISO) defines "user experience" as a "person's perceptions and responses that result from the use or

[9] *Id.*

[10] Zoe Schiffer, BUSINESS INSIDER, A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want, June 25, 2019, https://www.businessinsider.com/dark-patterns-online- shopping-princeton-2019-6.

[11] Sarah Perez, TECHCRUNCH, Sneaky subscriptions are plaguing the App Store, Oct. 15, 2018, https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store.

[12] Heather Long and Andrew Van Dam, *supra* note 3 ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh.  'You keep signing up for things and they make it really hard to cancel.'"); *see also* NEW MEDIA AND MARKETING, The problem with subscription marketing, Mar. 17, 2019, https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing.

[13] *Id.*

[14] *Id.*

anticipated use of a product, system or service."[15]   Dark patterns in UX are "carefully designed misleading interfaces by UX design experts that trick the users into choosing paths that they didn't probably want to take, thus fulfilling the business objectives, completely ignoring the requirements and ethics of users."[16]

36.    The term was first coined by cognitive scientist Harry Brignull, who borrowed from existing UX terminology.  In UX, designers refer to common, re-usable solutions to a problem as a "design pattern," and conversely to common mistakes to solutions as "anti-patterns."[17]  The term "dark patterns" was intended to "communicate the unscrupulous nature" of the design "and also the fact that it can be shadowy and hard to pin down."[18]  The image on the following page provides some examples of commonly employed dark patterns:[19]

[15] UIUX TREND, User Experience (UX): Process and Methodology, https://uiuxtrend.com/user-experience-uxprocess/.

[16] Joey Ricard, KLIZO SOLS. PVT. LTD., *UX Dark Patterns: The Dark Side Of The UX Design*, Nov. 9, 2020, https://klizos.com/ux-dark-patterns-the-dark-side-of-the-ux-design.

[17] Harry Brignull, MEDIUM, *Bringing Dark Patterns to Light*, June 6, 2021, https://harrybr.medium.com/bringing-dark-patterns-to-light-d86f24224ebf.

[18] *Id.*

[19] Sarbashish Basu, H2S MEDIA, *What is a dark pattern?  How it benefits businesses- Some examples*, Dec. 19, 2019, https://www.how2shout.com/technology/what-is-a-dark-pattern-how-it-benefit-businesses-with-some-examples.html.

CLASS ACTION COMPLAINT



37.     The origin of dark patterns can be traced to the use of applied psychology and A/B testing in UX.[20]  In the 1970s, behavioral science sought to understand irrational decisions and behaviors and discovered that cognitive biases guide all our thinking.  The image on the following page provides examples of cognitive biases, including some that Defendants employ in their cancellation process: [21]

---

[20] Brignull, *supra* note 17.

[21] Krisztina Szerovay, UX KNOWLEDGE BASE, *Cognitive Bias — Part 2*, Dec. 19, 2017, https://uxknowledgebase.com/cognitive-bias-part-2-fab5b7717179.

9



38.     But while the early behavioral research focused on understanding rather than intervention, later researchers, like Cass Sunstein and Richard Thaler (authors of the book *Nudge*) shifted focus and made the policy argument that institutions should engineer "choice architectures" in a way that uses behavioral science for the benefit of those whom they serve.[22]

39.     Another step in the development and application of such research is the use of A/B testing in UX.   A/B testing is a quantitative research method that presents an audience with two variations of a design and then measures which actions they take (or do not take) in response to each variant.[23]   UX designers use this method to determine which design or content performs best with the intended user base.[24]   For example, a large health care provider might A/B test whether a website visitor

---

[22] Arvind Narayanan *et al*., *Dark Patterns: Past, Present, and Future. The evolution of tricky user interfaces*, 18 ACM QUEUE 67-91, 2002, https://queue.acm.org/detail.cfm?id=3400901.

[23]   UXPin, *A/B Testing in UX Design: When and Why It's Worth It*, https://www.uxpin.com/studio/blog/abtesting-in-ux-design-when-and-why.

[24] *Id.*

is more or less likely to conduct a search of its doctors if the website's search function is labelled "SEARCH" versus simply identified by a magnifying glass icon.

40.     Unscrupulous UX designers subverted the intent of the researchers who discovered cognitive biases by using these principles in ways that undermined consumers' autonomy and informed choice, and they used A/B testing to turn behavioral insights into strikingly effective user interfaces that deceived consumers in ways that were more profitable to the company applying them.[25]  Dark patterns increase a company's ability to extract revenue from its users by nudging or tricking consumers to spend more money than they otherwise would, hand over more personal information, or see more ads.[26]

41.     Defendants have engaged in these unlawful subscription practices with great success.  In 2022, NordSec raised $100 million from investors, with the company valued at $1.6 billion.[27] NordSec's products and services have over 15 million users.

**B.     NordSec's Enrollment Process Violates the ARL**

42.     Upon information and belief, the payment screen for NordSec's enrollment process that Plaintiff used in October 2019 was materially similar to NordSec's recently used payment page, as reproduced on the next page:

---

[25] Narayanan *et al*., *supra* note 22.

[26] *Id.*

[27] Ingrid Lunden, NordVPN raises its first money, $100M at a $1.6B valuation, TECHCRUNCH, Apr. 6, 2022, https://techcrunch.com/2022/04/06/nord-security-the-startup-behind-nordvpn-raises-its-first-ever-funding-100m-at-a-1-6b-valuation.

43.     The fine print below the solid line that includes (insufficient) autorenewal disclosures is on NordSec's payment screen but is not visible unless the consumer scrolls down to view it.

44.     NordSec's payment page lacks the requisite disclosures and runs afoul of California law in several respects.

45.     The terms and conditions of NordSec's automatic renewal offer are not presented to consumers "clearly and conspicuously," as required by the ARL.  The automatic renewal language is not in larger type than the surrounding font, is colored light gray rather than a more conspicuous color, is not set off from the surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language.  Bus. & Prof. Code § 17602(a)(1) (requiring companies like NordSec to "present the automatic renewal off terms . . . in a clear and conspicuous manner").

46.     NordSec's automatic renewal offer is not "in visual proximity" to its request for consumers to consent to the offer.  *Id.* § 17602(a)(1).

47.     Instead, the overall design of the page, including the notice placement, font size, and color *deemphasize* the notice text rather than render it conspicuous.  The automatic renewal terms are not in visual connection with the purchase terms and are instead buried at the bottom of the page.  This makes it unlikely that consumers will even see the disclosures because they must scroll down to view

CLASS ACTION COMPLAINT

them, and they are presented in a light grey font against a lighter gray background and in a single-spaced format, which makes the disclosures difficult to read.

48.    Moreover, any supposed "disclosures" on the NordSec payment page are far overshadowed by the page's other components in a clear demonstration of the "Misinformation" dark pattern.  The payment page uses at least 12 different colors, presents information in differently sized fonts and in various boxes, and includes hyperlinks, drop-down menus styled as hyperlinks, two call-outs for add-on products, and 13 different logos.  In contrast, the automatic renewal terms are hidden at the bottom of the page, difficult to discern and easy to miss unless consumers scroll down on the screen to view them.

49.    NordSec's "Order Summary" box likewise does not sufficiently present the terms and conditions of its automatic renewal offer to consumers, nor does it present the consumer with an easily accessible disclosure of the methods that the consumer may use to cancel the subscription.

50.    When consumers click on one of the various payment methods on NordSec's payment page, those expanded boxes also do not disclose NordSec's autorenewal terms, let alone do so in a clear and conspicuous manner, nor do they present the consumer with any disclosure of the methods that the consumer may use to cancel the subscription, let alone one that is easily accessible.

51.    The NordSec payment page also fails to obtain consumers' affirmative consent to the automatic renewal terms and contains no mechanism for affirmatively consenting to the automatic renewal terms.  For example, there is no checkbox that consumers must click to indicate that they accept those terms.  *See id*. § 17602(a)(2).

52.    Nor does NordSec's automatic renewal offer clearly and conspicuously disclose how to cancel the contract in a manner that is capable of being retained by the consumer, in violation of the ARL.  *Id*. § 17602(a)(3).

53.    NordSec recently revised its payment page.  Although this page still does not provide the clear and conspicuous disclosures required by the ARL, it is unquestionably clearer than the Company's previous payment page.  The current version of NordSec's payment page is reproduced on the following page:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   **C. NordSec's Acknowledgement and Receipt Emails Violate the ARL**

18       54.     Upon information and belief, after Plaintiff enrolled in NordSec, NordSec sent Plaintiff

19   an email with the subject line "Welcome to NordVPN!"   A representative version of the

20   acknowledgement email sent to Plaintiff is shown on the following pages:

21
22
23
24
25
26
27
28

14





CLASS ACTION COMPLAINT

**Connect Now**

Don't leave gaps in your security. Explore all features and benefits NordVPN has to offer.

 **Protect all your devices**
You can use NordVPN on 6 devices at the same time. Find NordVPN apps for all devices <u>here</u>.

 **Fend off cyber threats**
Block web trackers, ads, and malicious websites and files with the Threat Protection feature for desktop apps. <u>Turn on</u>.

 **Check if your data hasn't leaked**
Scan the dark web for login details associated with your email address with Dark Web Monitor feature. <u>Check now</u>.

If you're in a country that restricts VPNs, click <u>here</u>.

Stay safe!
The NordVPN team



55.     Upon information and belief, after Plaintiff enrolled in NordSec, NordSec also sent Plaintiff an email containing the word "receipt" in the subject line.   A representative version of the receipt email sent to Plaintiff is shown on the following page:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26   56.   Neither the acknowledgement nor the receipt emails meet the post-purchase requirements
27   that the ARLs impose on an automatically renewing product or service.  *See* BUS. & PROF. CODE §
28   17602(a)(4).

57.     The acknowledgement and receipt emails violate the ARL because they do not clearly and conspicuously disclose that the automatic renewal will automatically renew unless the consumer cancels, *id.* § 17602(a)(4)(A), do not disclose the length and any additional terms of the renewal period, *id.* § 17602(a)(4)(B), and do not provide one or more methods by which a consumer can cancel the automatic renewal, *id.* § 17602(a)(4)(C).

58.     In fact, neither of these emails include any disclosure whatsoever about how to cancel a NordSec account.

**D.  NordSec's Cancellation Process Is Unfair and Deceptive**

59.     NordSec's cancellation process is not simple, cost-effective, timely, easy-to-use, nor readily accessible to consumers.  Instead, NordSec employs the "roach motel" dark pattern to get and keep consumers—and their payment methods—on its books:  it is easy to sign up for NordSec products and services, but hard to get out.

60.     NordSec buries its cancellation mechanism four layers deep in its customer account portal, with no clear path evident to the consumer for how to get there.  Canceling a NordSec subscription first requires consumers to (1) log into their customer account, and (2) select "Billing" from a list of at least nine options.  Once "Billing" is selected, the default view on the "Billing" page does not mention anything about cancellation, and instead shows the consumer's "Billing history."  Upon information and belief, NordSec's "Home" and "Billing" pages available to Plaintiff in approximately October 2019 were materially similar to NordSec's current Home and Billing pages copied on the following page:



61.     After navigating to NordSec's "Billing page," consumers wishing to cancel must then (3) know to navigate to the "Subscriptions" tab on the "Billing" page.  Once consumers access the "Subscriptions" tab, they are still not presented with a "Cancel" option.  Instead, consumers must then (4) understand that they need to click on "Manage" on a line pertaining to "Auto-renewal" to finally access a page where they can cancel their account.   Upon information and belief, NordSec's "Subscriptions" tab available to Plaintiff in approximately August 2023 was materially similar to the NordSec "Subscriptions" tab copied as the first image on the next page, as well as the page consumers view when they click "Manage" next to "Auto-renewal," in the second image on the following page:

62.     For consumers who manage to find and click "Cancel auto-renewal," the autorenewal is canceled.  But NordSec's multi-step cancellation process designed to resist cancellation efforts—a "roach motel" dark pattern—prevents consumers from finding and canceling autorenewal.  This violates the ARL because it is not cost-effective, timely, or easy-to-use.  BUS. & PROF. CODE § 17602(c).  NordSec does not provide a toll-free telephone number or electronic mail address consumers may contact to cancel the automatic renewal.  *Id.*

63.     NordSec's cancellation process also violates the ARL because it does not allow consumers to terminate the automatic renewal "at will, and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal . . . immediately."  *Id.* § 17602(d)(1).

64.     For those consumers who use NordSec's mobile application, like Plaintiff, there is no way in which to cancel autorenewal.  This is not cost-effective, timely, or easy-to-use.  *Id.* § 17602(c).

**E.     NordSec's Form Autorenewal Notice Violates the California ARL.**

65.     When NordSec automatically renews accounts where the initial plan term is one year or longer, the ARL requires the Company to provide consumers with notice of the upcoming renewal "at least 15 days and not more than 45 days before the automatic renewal offer or continuous service offer renews." BUS. & PROF. CODE § 17602(b)(2).

66.     Under the ARL, that notice must "clearly and conspicuously" disclose the following to the consumer: that the account will automatically renew unless the consumer cancels; the length and any additional terms of the renewal period; one or more cancellation methods; for notices sent electronically, a link to the cancellation process; and the business's contact information.  *Id.* §§ 17602(b), 17602(a)(4)(A)–(E).

67.     A representative image of NordSec's form notice email, sent to Plaintiff on October 17, 2022, is reproduced below:



CLASS ACTION COMPLAINT

68.     This email violates the ARL in several respects.   First, rather than clearly and conspicuously disclose the date by which the consumer must cancel to avoid being charged for the automatic renewal, the email instead misleads the consumer by prominently and explicitly stating the date on which the current subscription period expires (here, "December 1st"), even though the consumer must in fact cancel at least 14 days prior to that date to avoid being charged again.

69.     Though the email states that the consumer "will be billed" automatically "in 30 days unless [they] cancel before the payment is charged," that statement's effectiveness is undone by the remainder of the email, which provides a specific expiration date for the current subscription.   Indeed, NordSec sets the expiration date off in a separate paragraph consisting of only a single short, declarative sentence.   Thus, by providing a prominent, express expiration date while noting only that the consumer will be billed "in 30 days" absent cancellation NordSec creates the impression that the consumer can avoid being charged for autorenewal if they cancel by the expiration date.

70.     Moreover, NordSec's email fails to clearly and conspicuously disclose by what time a consumer must cancel in order to avoid a charge.   For example, the email Plaintiff received was sent on October 17, 2022 at 8:05 p.m. PDT.   But a consumer who attempted to cancel their NordSec autorenewal on November 16, 2022 (30 days later) might find that they were too late: Plaintiff was billed automatically on November 16, 2022 at 7:06 p.m. PST, with nearly 5 hours remaining in the day.

71.     Second, NordSec's email does not include "[o]ne or more methods by which a consumer can cancel the automatic renewal or continuous service."   *See* Bus. & Prof. Code § 17602(a)(4)(C). The email states that the user must "cancel" to avoid a charge but provides no information on how to do so.

72.     Third and similarly, NordSec's email is sent electronically but does not "include either a link that directs the consumer to the cancellation process, or another reasonably accessible electronic method that directs the consumer to the cancellation process if no link exists."   *See* Bus. & Prof. Code § 17602(a)(4)(D).   Indeed, the only link that NordSec provides (which, rather than appear in a clear and

conspicuous manner is presented in tiny, light gray font at the bottom of the notice) is to its "Help center," which does even include the word "cancel" on its landing page.[28]

73.    Fourth, the email does not provide any contact information for the business, in violation of BUS. & PROF. CODE § 17602(a)(4)(E).

74.    The email, sent prior to automatic renewal, is in contrast to information that NordSec is willing to provide in the receipt email it sends *after* a consumer has been charged—and when it is too late to cancel and avoid the charge.  Though the receipt email also fails to provide required information or to do so in a clear and conspicuous manner, it does at least attempt to provide consumers with clues on how to cancel.  For example, as shown below, the receipt email states that the consumer "can manage [their] subscription <u>here</u>" where "<u>here</u>" is a hyperlink to a login page for NordSec's account dashboard. It also advises (albeit again in a manner that is not clear and conspicuous) that the consumer "can cancel a recurring subscription from your Nord Account" and tells the consumer that they may "[g]et in touch" with the company using the email address <u>support@nordaccount.com</u>, as reproduced below:



## Your payment confirmation and receipt

| Item | Price |
| --- | --- |
| NordVPN 1 year subscription | $99.00/year |

Sales tax 0% - $0.00

Total: $99.00/year

Payment method: Credit Card
Payment date: Nov 17, 2022 03:06:11 AM UTC

You can manage your subscription here.

You can cancel a recurring subscription from your Nord Account.

Need help? Get in touch at support@nordaccount.com

---

[28] https://support.nordvpn.com/hc/en-us (last visited April 25, 2024).

CLASS ACTION COMPLAINT

**F.     NordSec Does Not Comply with the California ARL's Requirements with Respect to Material Changes to Consumers' Automatic Renewal Terms**

75.     In at least July 2020 and July 2022, NordSec made material changes to the automatic renewal terms applicable to Plaintiff and other consumers whose accounts were set to automatically renew.

76.     At all relevant times, the ARL required NordSec to "provide the consumer with a clear and conspicuous notice of the material change and provide information regarding how to cancel in a manner that is capable of being retained by the consumer."  BUS. & PROF. CODE § 17602(e) (eff. July 1, 2022).[29]

77.     Under the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." BUS. & PROF. CODE § 17601(c).

78.     NordSec's attempts to notify consumers about material changes to the terms of their automatic renewal offer failed to comply with the ARL.

79.     First on, on June 26, 2020, NordSec sent consumers an email regarding updates to NordSec's "Terms of Service" effective July 1, 2020.  In relevant part, the email stated that the Company made the following changes:

- "Updated the notification procedure. We will inform you of the changes to the Terms when they are important for your subscription or affect your rights and obligations."

- "Included more details in the Payments section to give you more clarity on how we process your payments and how our subscription works."

---

[29] The same requirement regarding material changes was previously found subsection (d) of in BUS. & PROF. CODE § 17602.  *See* BUS. & PROF. CODE § 17602(d) (eff. Jan. 1, 2022); BUS. & PROF. CODE § 17602(d) (eff. July 1, 2018).

CLASS ACTION COMPLAINT

80.     The changes NordSec made to its terms on July 1, 2020 were material changes to the terms of its customers' automatic renewals.

81.     An excerpt of the June 26, 2020 email sent to Plaintiff is reproduced below:

# Nord Account, new Legal Hub, and Terms of Service and Privacy Policy update

We are launching Nord Account, which unifies all Nord services, helps you manage your accounts from a single place, and log in with a click. It comes with a new Legal Hub, where you'll find all relevant legal information. As a result, we have updated the Terms of Service and Privacy Policy. The changes come into effect on July 1, 2020 and apply to all Nord products.

**The changes we made to the Terms of Service:**

- Changed the structure to include general and additional terms. This will provide more clarity and unify the terms for all our products.
- Updated the notification procedure. We will inform you of the changes to the Terms when they are important for your subscription or affect your rights and obligations.
- Included additional wording for our trademark protection to make sure our trademarks are not misused.
- Included information about security updates and application versions that we support so you could make sure you're using the latest and updated software.
- Included more details in the Payments section to give you more clarity on how we process your payments and how our subscription works.
- Removed the Installment payments section — few users used this option.
- Clarified the terms regarding minors.
- Streamlined the Prohibited and restricted uses section.

82.     The June 26, 2020 email fails to comply with the ARL's material change provision because it does not provide clear and conspicuous notice of the changes that would be made to consumers' existing autorenewal terms on July 1, 2020. Instead, it offers only vague statements that changes have been made, and does so in text the same size, and in the same type, font, or color, as the surrounding language.  The format of the June 26, 2020 also fails to set the language off from the surrounding text of the same size in a manner that calls attention to the language.

83.     The June 26, 2020 email also fails to comply with the ARL's material change provision because it does not "provide information regarding how to cancel in a manner that is capable of being retained by the consumer." Indeed, provides *no* information on how to cancel at all.

84.     Second on, on June 15, 2022, NordSec sent consumers an email regarding updates to NordSec's "Terms of Service" effective July 1, 2022.   In relevant part, the email stated that the Company made the following changes:

- **New and clearer rules for subscriptions and auto-renewals.** We've revised and reorganized some of the terms regarding subscriptions and auto-renewals. We now emphasize in more detail that our paid services are provided on a subscription basis and will be renewed automatically unless you cancel the subscription before the upcoming charge."

- **Clarified rules for cancelation and refunds.** We've provided more details on cancelation and refund policies."

85.     An excerpt of the June 15, 2022 email is reproduced below:

> Dear customer,
>
> We're updating our Terms of Service and Privacy Policy. These changes will take effect on July 1, 2022, and won't have any technical impact on the use of Nord's services. We're letting you know ahead of time what's changing.
>
> **Summary of the changes to the Terms of Service:**
>
> - **Improved readability.** The updated documents are easier to read, have a clearer language, and provide more examples. We've added definitions to help you better understand key aspects and legal concepts we're using.
> - **New and clearer rules for subscriptions and auto-renewals.** We've revised and reorganized some of the terms regarding subscriptions and auto-renewals. We now emphasize in more detail that our paid services are provided on a subscription basis and will be renewed automatically unless you cancel the subscription before the upcoming charge.
> - **Clarified rules for cancelation and refunds.** We've provided more details on cancelation and refund policies.
> - **New and clearer rules for prohibited and restricted use.** Our Terms of Service now better define how our services work and what rights and obligations users have. We want to help you understand

CLASS ACTION COMPLAINT

86.     The June 15, 2022 email fails to comply with the ARL's material change provision because it does not provide clear and conspicuous notice of the changes that would made to consumers' existing autorenewal terms on July 1, 2022.  Instead, it offers only vague statements that changes will be made and does so using a format that is the exact same format (bullet point with a bolded clause followed by an unbolded sentence(s)) as all other changes to NordSec's "Terms of Service" more broadly.  Thus, the format of the June 15, 2022 fails to "set off from the surrounding text of the same size" the language regarding material changes to consumers' automatic renewal terms.

87.     The June 15, 2022 email also fails to comply with the ARL's material change provision because it does not "provide information regarding how to cancel in a manner that is capable of being retained by the consumer." Indeed, provides **no** information on how to cancel at all.

88.     The changes NordSec made to its terms on July 1, 2022 were material changes to the terms of its customers' automatic renewals. For example, the June 15, 2022 email states that the Terms of Service will be changed to provide "more details on cancelation and refund polices."  A "description of [a company's] cancellation policy" is one of the automatic renewal offer terms that must be disclosed to consumers under the ARL, BUS. & PROF. CODE § 17601(b)(2), and thus notice of any material changes to that policy must be made in a manner that complies with BUS. & PROF. CODE § 17602(e), which NordSec's June 15, 2022 email fails to do.

**G.     How NordSec's ARL Violations Injured Plaintiff**

89.     Plaintiff was injured by NordSec's ARL violations in its enrollment process because had Plaintiff known that he was enrolling in an automatically renewing subscription, he would not have enrolled in a NordSec subscription.

90.     On approximately October 30, 2019 Plaintiff signed up for two years of NordSec's VPN service NordVPN.

91.     Upon information and belief, on October 30, 2019, Plaintiff received a receipt from NordSec for $119.76 for the VPN service.

92.     After signing up for NordSec's VPN service, Plaintiff downloaded NordVPN.

93.     Plaintiff decided he did not want to continue with NordSec after his plan ended.

94.     Having decided not to continue with NordSec, Plaintiff believed that once his plan period was over, he would no longer be a NordSec customer.  Indeed, Plaintiff never expected to pay NordSec anything beyond what he had already paid in October 2019 because NordSec did not adequately disclose to Plaintiff that it would automatically enroll him in its subscription program and begin charging non-refundable fees of $99 on a yearly basis after his two-year plan concluded.

95.     Nonetheless, on or about November 16, 2021 (more than two years after Plaintiff purchased the two-year plan) NordSec charged $99 to Plaintiff's credit card without his knowledge or permission for a one-year NordVPN subscription set to begin on or about December 2, 2021.

96.     On or about November 16, 2022, NordSec again charged $99 to Plaintiff's credit card without his knowledge or permission for a one-year NordVPN subscription set to begin on or about December 2, 2022.

97.     Upon information and belief at some point after NordSec made a second unauthorized charge of $99 to his credit card, Plaintiff discovered that NordSec was autorenewing his account without his permission.

98.     Thereafter, upon information and belief Plaintiff attempted to cancel his NordSec account via the Company's mobile app but was unable to do so.  He then searched for information on the internet about how to cancel the unauthorized subscription but was nonetheless unable to figure out how to cancel.

99.     NordSec again charged Plaintiff's credit card $99 without his permission on or about November 16, 2023 for a yearlong NordVPN plan set to begin on or about December 2, 2023.

100.     Plaintiff was finally able to cancel autorenewal of his NordSec account on April 23, 2024 with the assistance of his counsel.

101.     NordSec did not "clearly and conspicuously" disclose to Plaintiff that it would automatically renew his NordVPN plan for a yearlong term at $99 after his initial two-year plan expired. NordSec's automatic renewal clause was not included "clearly and conspicuously" in the contract or contract offer.  Nor did NordSec "clearly and conspicuously" disclose how to cancel Plaintiff's NordSec subscription, including in connection with material changes in price and length made in 2021, 2022, and 2023 to the terms of Plaintiff's initial plan period.

102.   Plaintiff did not authorize or want his NordSec subscription to renew.

103.   Plaintiff was injured when NordSec extracted $297 from his credit card account for NordVPN subscriptions he did not want and did not authorize payment for.

104.   Plaintiff was further injured by NordSec's ARL violations because had he known the truth of NordSec's misleading and intentionally difficult cancellation process, he would not have enrolled in NordSec subscriptions.  Moreover, had NordSec provided a simple, cost-effective, timely, easy-to-use cancellation mechanism, Plaintiff would have been able to avoid at least one NordSec's unauthorized charges of $99 to his credit card.

105.   Given that NordSec has engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of NordSec's last wrongful act against Plaintiff, which was in November of 2023, when NordSec last charged Plaintiff for an automatically renewing subscription he did not want and did not authorize payment for.

## CLASS ACTION ALLEGATIONS

106.   Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all NordSec customers in the United States who were subjected to Defendants' misleading subscription practices from the earliest allowable date through the date of judgment (the "Class").

107.   Plaintiff also brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all NordSec customers in the state of [*e.g.*, California] (including customers of companies NordSec acts as a successor to) who were automatically enrolled into and charged for at least one month of NordSec membership by Defendants at any time from [applicable statute of limitations period] to the date of judgment (the "Subclasses").

108.   As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants.  Defendants have engaged in uniform and standardized conduct toward the Class and this case is about the responsibility of Defendants, at law and in equity, for their knowledge and conduct in deceiving their customers.  Defendants' conduct did not meaningfully differ

29

among individual Class Members in their degree of care or candor, their actions or inactions, or in their false and misleading statements or omissions.  The objective facts on these subjects are the same for all Class Members.

109.    Excluded from the Class are:  Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants.  Also excluded are federal, state and local government entities; and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

110.    Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add Subclasses, when Plaintiff files his motion for class certification.

111.    Plaintiff does not know the exact size of the Class since such information is in the exclusive control of Defendants.  Plaintiff believes, however, that the Class encompasses thousands of consumers whose identities can be readily ascertained from NordSec's records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

112.    The Class is ascertainable because its members can be readily identified using data and information kept by Defendants in the usual course of business and within their control.  Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

113.    Plaintiff is an adequate class representative.  Plaintiff's claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class.  Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by Defendants.  Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendants' conduct.

114.    Plaintiff will fairly and adequately protect the interests of all Class Members.  Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Class.

115.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.   Whether Defendants' conduct violates the ARL;

      b.   Whether Defendants' conduct violates the applicable California consumer protection statutes;

      c.   Whether Defendants' conduct violates the applicable common law doctrines;

      d.   Whether Defendants were unjustly enriched as a result of their conduct;

      e.   Whether Class Members have been injured by Defendants' conduct;

      f.   Whether, and to what extent, equitable relief should be imposed on Defendants to prevent them from continuing their unlawful practices; and

      g.   The extent of class-wide injury and the measure of damages for those injuries.

116.     A class action is superior to all other available methods for resolving this controversy because (1) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; (2) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct; (3) Defendants have acted or refused to act on grounds generally applicable to all Class Members; and (4) questions of law and fact common to the Class predominate over any questions affecting only individual Class Members.

117.     Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

      a.   Whether Defendants' conduct violates the ARL;

      b.   Whether Defendants' conduct violates the applicable California consumer protection statutes;

      c.   Whether Defendants' conduct violates the applicable common law doctrines;

      d.   Whether Defendants were unjustly enriched as a result of their conduct;

      e.   Whether Class Members have been injured by Defendants' conduct;

CLASS ACTION COMPLAINT

f.   Whether, and to what extent, equitable relief should be imposed on Defendants to prevent them from continuing their unlawful practices; and

g.   The extent of class-wide injury and the measure of damages for those injuries.

118.   Accordingly, this action satisfies the requirements set forth under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rule of Civil Procedure.

## COUNT I

### CALIFORNIA AUTOMATIC RENEWAL LAW
### (ON BEHALF OF THE CALIFORNIA CLASS UNDER CALIFORNIA LAW)

119.   Plaintiff incorporates by reference all preceding and subsequent paragraphs.

120.   Plaintiff brings this claim on his own behalf and on behalf of each member of the California Class.

121.   The California Automatic Renewal Law, BUS. & PROF. CODE §§ 17600 *et seq.,* became effective on December 1, 2010.

122.   BUS. & PROF. CODE §§ 17600 *et seq.* declares unlawful "the practice of ongoing charging of consumer credit or debit cards or third-party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  To effect its purpose, the law requires that certain clear and conspicuous disclosures be made to any California consumer being offered a product or service that will automatically renew at some point in the future.  NordSec's conduct as alleged in this Complaint was unlawful because it failed to comply with the requirements of BUS. & PROF. CODE § 17602.  NordSec's failures to comply include at least the following independent violations:

a.   NordSec failed to present the terms of its automatic renewal or continuous service offer in a clear and conspicuous manner before fulfilling the subscription and in visual proximity to the request for consent to the offer, as required by BUS. & PROF. CODE § 17602(a)(1);

b.   NordSec charged Plaintiff's and the Class's credit or debit cards, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous offer terms, as required by BUS. & PROF. CODE § 17602(a)(2);

c.   NordSec failed to provide an acknowledgment that includes its cancelation policy and information regarding how to cancel as required by BUS. & PROF. CODE § 17602(a)(3);

d.  NordSec failed to provide adequate notice that its subscriptions would automatically renew unless the consumer canceled the service at least 15 and not more than 45 days before the subscription renewed as required by BUS. & PROF. CODE § 17602(b)(2);

e.  NordSec's cancellation process is not cost-effective, timely, or easy-to-use as required by BUS. & PROF. CODE § 17602(c);

f.  NordSec's cancellation process does not allow consumers to terminate the automatic renewal "at will, and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal . . . immediately" as required by BUS. & PROF. CODE § 17602(d)(1); and

g.  NordSec's material change to the automatic renewal offer failed to "provide the consumer with a clear and conspicuous notice of the material change and provide information regarding how to cancel in a manner that is capable of being retained by the consumer" as required by BUS. & PROF. CODE § 17602(e).

123.   Defendants' violations of the ARL renders the NordSec subscription as an "unconditional gift to the consumer." *Id.* § 17603.

124.   Plaintiff and the Class are entitled to a declaration that NordSec's conduct was and is unlawful in that its ongoing practices fail to comply with the requirements of the Automatic Renewal Law.

## <u>COUNT II</u>

**CALIFORNIA UNFAIR COMPETITION LAW–UNLAWFUL BUSINESS PRACTICES**
**(ON BEHALF OF THE CALIFORNIA CLASS AGAINST DEFENDANTS)**

125.   Plaintiff incorporates by reference all preceding and subsequent paragraphs.

126.   Plaintiff brings this claim on his own behalf and on behalf of each member of the California Class.

127.   BUS. & PROF. CODE § 17200 *et seq.* (the "Unfair Competition Law" or "UCL") prohibits acts of "unfair competition," including any unlawful, fraudulent or unfair business acts or practices as well as any acts contrary to the requirements of BUS. & PROF. CODE § 17500.

128.   Under the "unlawful" prong of the UCL, a violation of another law is treated as unfair competition and is independently actionable.

129.   NordSec committed unlawful business practices under the UCL because it imposed charges without complying with all applicable requirements of BUS. & PROF. CODE §§ 17600 *et seq.*, as alleged above.

130.    As a result of NordSec's unlawful business practices, Plaintiff suffered an injury in fact and lost money or property.

131.    Pursuant to BUS. & PROF CODE §17203, Plaintiff and the Class are entitled to an order: (1) requiring NordSec to make restitution to Plaintiff and the Class; (2) enjoining NordSec from charging Plaintiff's and Class members' credit cards, debit cards, and/or third party payment accounts until such time as NordSec obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms and meets all other legal requirements; and (3) enjoining NordSec from making automatic renewal or continuous service offers in the State of California that do not comply with the California Automatic Renewal Law.

## COUNT III

### CALIFORNIA UNFAIR COMPETITION LAW–UNFAIR BUSINESS PRACTICES

132.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

133.    Plaintiff brings this claim on his own behalf and on behalf of each member of the California Class.

134.    BUS. & PROF. CODE §§ 17200 *et seq.* (the "Unfair Competition Law" or "UCL") prohibits acts of "unfair competition," including any unlawful, fraudulent or unfair business acts or practices as well as any acts contrary to the requirements of BUS. & PROF. Code § 17500.

135.    The courts have adopted differing tests for determining whether a business act or practice is "unfair" under the UCL. NordSec's practices as alleged above were and are "unfair" and therefore violative of the UCL, under any and all of these tests. NordSec's practices have resulted in substantial injury to consumers that was not outweighed by any countervailing benefits to consumers or to competition and was not reasonably avoidable by the consumers themselves. Alternatively, NordSec's practices offended an established public policy and/or were immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Alternatively, NordSec's practices were contrary to a public policy "tethered" to a specific constitutional, statutory or regulatory provision.

136.    As a result of NordSec's unlawful, unfair, and fraudulent business practices, Plaintiff suffered an injury in fact and lost money or property.

137.    Pursuant to BUS. & PROF CODE §17203, Plaintiff and the Class are entitled to an order: (1) requiring NordSec to make restitution to Plaintiff and the Class; (2) enjoining NordSec from charging Plaintiff's and Class members' credit cards, debit cards, and/or third party payment accounts until such time as NordSec obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms and meets all other legal requirements; and (3) enjoining NordSec from making automatic renewal or continuous service offers in the State of California that do not comply with California Automatic Renewal Law.

**COUNT IV**

**CALIFORNIA UNFAIR COMPETITION LAW–FRAUDULENT PRACTICES
AND FALSE ADVERTISING**

138.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

139.    Plaintiff brings this claim on his own behalf and on behalf of each member of the California Class.

140.    BUS. & PROF. CODE §§ 17200, *et seq.* (the "Unfair Competition Law" or "UCL") prohibits acts of "unfair competition," including any unlawful, fraudulent or unfair business acts or practices as well as any acts contrary to the requirements of BUS. & PROF. CODE § 17500.

141.    NordSec's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public, and thus constituted fraudulent business practices in violation of the UCL.  Moreover, those acts, omissions, nondisclosures, and misleading statements were contrary to the provisions of the False Advertising Law, BUS. & PROF. CODE § 17500 and constitute violations of the UCL for that reason as well.

142.    As a result of NordSec's unlawful and unfair business practices, Plaintiff suffered an injury in fact and lost money or property.

143.    Pursuant to BUS. & PROF. CODE §17203, Plaintiff and the Class are entitled to an order: (1) requiring NordSec to make restitution to Plaintiff and the Class; (2) enjoining NordSec from charging Plaintiff's and Class members' credit cards, debit cards, and/or third party payment accounts until such time as NordSec obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms and meets

all other legal requirements; and (3) enjoining NordSec from making automatic renewal or continuous service offers in the State of California that do not comply with California Automatic Renewal Law.

<u>**COUNT V**</u>

**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**

144.   Plaintiff incorporates by reference all preceding and subsequent paragraphs.

145.   Plaintiff brings this claim on his own behalf and on behalf of each member of the California Class.

146.   The California Consumers Legal Remedies Act (the "CLRA"), CIV. CODE § 1770(a)(14), prohibits certain specified unlawful acts and practices if utilized in connection with any transaction involving the sale or lease of goods or services to a consumer.

147.   NordSec violated CIV. CODE § 1770, subdivisions (a)(5), (a)(9), (a)(14) and (a)(16) by, inter alia, representing that NordSec's goods and services have certain characteristics that they do not have; advertising goods and services with the intent not to sell them as advertised; representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law; and representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

148.   Plaintiff and the Class members are "consumers" within the meaning of CIV. CODE § 1761(d) in that Plaintiff and members of the Class were charged by NordSec in connection with transactions involving goods or services sought or acquired for personal, family, or household purposes.

149.   NordSec's automatically renewing subscriptions constitute "goods or services" within the meaning of CIV. CODE § 1761.

150.   Plaintiff has standing to pursue these claims because he suffered injury in fact and a loss of money and/or property as a result of the wrongful conduct alleged herein.

151.   The charges imposed by NordSec, purportedly in exchange for automatically renewing subscriptions, on Plaintiff and Class Members are "transactions" within the meaning of CIV. CODE § 1761(e).

152.   As a direct and proximate result of result of NordSec's violations of the CLRA, Plaintiff and the Class were wrongfully charged fees for NordSec's automatically renewing subscriptions.

153.    NordSec's conduct alleged herein was undertaken knowingly, willfully, and with oppression, fraud, and/or malice, within the meaning of CAL. CIV. CODE § 3294(c).

154.    Accordingly, Plaintiff and members of the Class seek an injunction prohibiting NordSec from engaging in the unlawful practices alleged herein.  If NordSec fails to rectify or agree to rectify the unlawful acts detailed above and fails to give notice to all affected consumers within 30 days of written notice pursuant to § 1782 of the CLRA, Plaintiff will amend this Complaint to add claims for compensatory damages, and restitution of any ill-gotten gains due to NordSec's acts and practices, as well as any other remedies the Court may deem appropriate.

### COUNT VI

### CONVERSION

### (ON BEHALF OF A MULTISTATE CLASS UNDER CALIFORNIA LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANTS DO BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)

155.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

156.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Multistate Class under California law or under the laws of each of the states where Defendants do business that permit an independent cause of action for conversion, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

157.    In all states where Defendants do business, there is no material difference in the law of conversion as applied to the claims and questions in this case.

158.    Plaintiff and the Class own and have a right to possess the money that is in their respective bank accounts, internet payment accounts, and/or credit cards.

159.    Defendants substantially interfered with Plaintiff and the Class's possession of this money by knowingly and intentionally making unauthorized charges to their bank accounts, internet payment accounts, and/or credit cards for NordSec subscriptions.

160.    Plaintiff and the Class never consented to Defendants taking of this money from their bank accounts, internet payment accounts, and/or credit cards.

161.    Defendants wrongfully retained dominion over this monetary property and/or the time-value of the monetary property.

162.    Plaintiff and the Class have been damaged by Defendants' wrongful taking of such money from their bank accounts, internet payment accounts, and/or credit cards in an amount that is capable of identification through Defendants' records.

163.    By reason of the foregoing, Defendants are liable to Plaintiff and the Class for conversion in an amount to be proved at trial.

## COUNT VII

### UNJUST ENRICHMENT

**(ON BEHALF OF A MULTISTATE CLASS UNDER CALIFORNIA LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANTS DO BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)**

164.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

165.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Multistate Class under California law or the laws of each of the states where Defendants do business that permit an independent cause of action for unjust enrichment, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

166.    In all states where Defendants do business, there is no material difference in the law of unjust enrichment as applied to the claims and questions in this case.

167.    As a result of their unjust conduct, Defendants have been unjustly enriched.

168.    By reason of Defendants' wrongful conduct, Defendants have benefited from receipt of improper funds, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

169.    As a result of Defendants' conduct it would be unjust and/or inequitable for Defendants to retain the benefits of its conduct without restitution to Plaintiff and the Class.   Accordingly, Defendants must account to Plaintiff and the Class for their unjust enrichment.

## COUNT VIII

### NEGLIGENT MISREPRESENTATION

**(ON BEHALF OF A MULTISTATE CLASS UNDER CALIFORNIA LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANTS DO BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)**

170.    Plaintiff incorporates by reference all preceding and subsequent paragraphs..

171.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Multistate Class under California law or the laws of each of the states where Defendants do business that permit an independent cause of action for negligent misrepresentation, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

172.    In all states where Defendants do business, there is no material difference in the law of negligent misrepresentation as applied to the claims and questions in this case.

173.    Defendants failed to disclose material facts concerning their subscription practices including:

    a.    NordSec failed to disclose the terms of its automatic renewal or continuous service offer in a clear and conspicuous manner before fulfilling the subscription and in visual proximity to the request for consent to the offer, as required by BUS. & PROF. CODE § 17602(a)(1);

    b.    NordSec failed to disclose that it charged Plaintiff's and the Class's credit or debit cards, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous offer terms, as required by BUS. & PROF. CODE § 17602(a)(2);

    c.    NordSec failed to provide an acknowledgment that discloses its cancelation policy and information regarding how to cancel as required by BUS. & PROF. CODE § 17602(a)(3);

    d.    NordSec failed to disclose that its subscriptions would automatically renew unless the consumer canceled the service at least 15 and not more than 45 days before the subscription renewed as required by BUS. & PROF. CODE § 17602(b)(2);

    e.    NordSec failed to disclose that its cancellation process is not cost-effective, timely, or easy-to-use as required by BUS. & PROF. CODE § 17602(c);

    f.    NordSec failed to disclose that its cancellation process does not allow consumers to terminate the automatic renewal "at will, and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal . . . immediately" as required by BUS. & PROF. CODE § 17602(d)(1); and

    g.    NordSec's material change to the automatic renewal offer failed to "provide the consumer with a clear and conspicuous notice of the material change and provide

39

information regarding how to cancel in a manner that is capable of being retained by the consumer" as required by Bus. & Prof. Code § 17602(e).

174.    NordSec had a legal duty to provide disclosures as required by Bus. & Prof. Code §§ 17602.

175.    Defendants sold Plaintiff and the Class NordSec subscriptions without making the disclosures required by law.

176.    Defendants' failure to disclose these material facts led Plaintiff and the Class to incorrectly believe that their NordSec subscriptions would not be recurring charges.

177.    Defendants had a duty to disclose the material information they concealed as to the NordSec subscription and cancelation process charge because the information was known and accessible only to Defendants, Defendants had superior knowledge and access to the facts, Defendants authored the web pages and emails containing the inadequate disclosures, and Defendants knew the facts were not known to or reasonably discoverable by Plaintiff and the Class.

178.    Plaintiff was unaware of these material facts and would not have agreed to enroll in a NordSec subscription if he had known these concealed and/or suppressed facts.

179.    Defendants understand that customers like Plaintiff and the Class desire accurate and truthful information in online contracts for a serious purpose, namely, accurately managing their personal finances.

180.    Plaintiff and the Class reasonably relied on Defendants' omissions.

181.    Defendants' negligent misrepresentation caused damage to Plaintiff and the Class, who are entitled to damages and other legal and equitable relief as a result.

182.    Therefore, Defendants are liable to Plaintiff and Class Members for the damages that they have suffered as a result of Defendants' actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)    Issue an order certifying the Classes defined above, appointing the Plaintiff as Class representative, and designating Milberg Coleman Bryson Phillips Grossman, PLLC and Wittels McInturff Palikovic as Class Counsel;

(b)    Find that Defendants have committed the violations of law alleged herein;

(c)     Determine that Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Nationwide Class or, alternatively, the State Classes;

(d)     Enter an order granting all appropriate relief including injunctive relief on behalf of the State Classes under the applicable state laws;

(e)     Render an award of compensatory damages of at least $100,000,000, the exact amount of which is to be determined at trial;

(f)     Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

(g)     Declare that Defendants have committed the violations of law alleged herein;

(h)     Render an award of punitive damages;

(i)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(j)     Grant all such other relief as the Court deems appropriate.


Dated:  April 26, 2024.

San Diego, California.

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

s/ *John J. Nelson*
John J. Nelson (SBN 3175985)
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
jnelson@milberg.com

Scott C. Harris*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, North Carolina 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
sharris@milberg.com


*(Additional Counsel on next page)*

CLASS ACTION COMPLAINT

**WITTELS MCINTURFF PALIKOVIC**

J. Burkett McInturff*
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jbm@wittelslaw.com

*Co-Counsel for Plaintiff and the Proposed Class*

*\* Motion for pro hac vice admission forthcoming*