# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| **DENNIS HANSCOM,** | Case NO.: 3:24-cv-00277 |
| On Behalf of Himself and All Others Similarly Situated, | **CLASS ACTION COMPLAINT** |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **NORDSEC LTD., NORDSEC B.V., NORDVPN S.A., NORD SECURITY INC., and TEFINCOM S.A. d/b/a NordVPN,** | |
| **Defendants.** | |

Plaintiff Dennis Hanscom ("Plaintiff"), by his undersigned attorneys, Milberg Coleman Bryson Phillips Grossman, PLLC and Wittels McInturff Palikovic, brings this consumer protection action in his individual capacities and on behalf of a class of consumers defined below against Defendants NordSec Ltd., NordSec B.V., Nordvpn S.A., Nord Security Inc., and Tefincom S.A. d/b/a NordVPN (hereafter, "Defendants," "NordSec," or the "Company") and hereby alleges the following with knowledge as to his own acts and upon information and belief as to all other acts:

## INTRODUCTION

1.      This is a proposed class action lawsuit challenging NordSec's use of deceptive and illegal "automatic renewal" practices to dupe consumers into paying for unwanted, pricey subscriptions to NordSec's virtual private network and other services, which subscriptions NordSec intentionally makes difficult to cancel.

2.      Defendants offer a suite of products and services to consumers that are intended to provide subscribers with privacy and protection from cybersecurity threats while using the internet. Those offerings include a VPN service called "NordVPN," a password manager called "NordPass," and an encrypted cloud storage service called "NordLocker."

3.      Members of the public are directed to NordSec's website through online searches or by advertising for the Company's VPN and/or other consumer services.  NordSec advertises widely online and on dozens of podcasts.  NordSec's advertising touts the benefits that enrolling in its products and services allegedly offers the prudent consumer; for example, the Company claims that its VPN service provides consumers "safe and private access to the internet" and that it is "trusted by tech experts and users."

4.      While consumers sign up for NordSec's privacy and security products and services with the intent of protecting their information online, unbeknownst to these consumers NordSec

is actually collecting consumers' payment information for use in its illegal and deceptive autorenewal scheme.

5.     NordSec's subscription enrollment and cancellation process is deceptive and violates the North Carolina automatic renewal law because it fails to clearly and conspicuously disclose the terms of the automatic renewal before consumers purchase a NordSec subscription, fails to clearly and conspicuously disclose how to cancel the automatic renewal in the Company's acknowledgement emails sent to consumers after they purchase a NordSec subscription, and fails to provide written notice that the contact will automatically renew at least 15 days but no earlier than 45 days before the subscription automatically renews.

6.     NordSec's trial offer and subscription has a "negative option" renewal policy, which means the trial offer automatically converts to a fee-based membership that regularly renews unless consumers take affirmative steps to cancel.  Due to NordSec's negative option renewal policy, many consumers who purchase a NordSec product or service ultimately end up paying fees for a NordSec subscription that they do not want.

7.     Once a consumer signs up with NordSec, the Company employs a number of strategies designed to ensure the consumer does not stop paying for its products.  These deceptive design practices aim to manipulate users into taking certain actions and exploit known frailties in human cognitive processing are known as "dark patterns."

8.     For example, canceling a NordSec subscription is made exceedingly difficult and requires a consumer to figure out—with no help from the Company—how to navigate NordSec's account settings to bring their recurring payments to a halt.

9.     And for those consumers who contact the Company directly prior to the end of their current subscription period, NordSec refuses to cancel their upcoming payments and instead only turns off autorenewal for subsequent payments.

10.    To protect North Carolina consumers from deceptive autorenewal practices such as these, North Carolina enacted its automatic renewal law (the "ARL") to protect consumers from deceptive autorenewal practices like those of Defendants.   N.C.G.S.A. § 75-41 (the "North Carolina ARL").  The North Carolina ARL requires in part that any person offering a contract that "automatically renews unless the consumer cancels the contract" must: (1) disclose "the automatic renewal clause clearly and conspicuously in the contract or contract offer," and (2) disclose "clearly and conspicuously how to cancel the contract in the initial contract, contract offer, or with delivery or products or services."  N.C.G.S.A. §§ 75-41(a)(1)–(2).  NordSec's subscription and acknowledgement processes violate the North Carolina ARL.  A violation of the North Carolina ARL "renders the automatic renewal clause void and unenforceable."  N.C.G.S.A. § 75-41(e).

11.    Defendants are well aware that their scheme is deceptive and unlawful, as complaints about NordSec are legion, with hundreds of consumers complaining on sites like Trustpilot, SiteJabber, and Reddit or directly to NordSec.

12.    Nevertheless, NordSec continues to subject members of the public to its unlawful autorenewal scheme and Defendants continue to reap significant monetary benefits from it.

13.    Only through a class action can consumers remedy Defendants' unlawful practices. Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge NordSec's improper conduct, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Furthermore, many customers do not realize they are victims of NordSec's unlawful acts and continue to be charged to this day.  With this class action, Plaintiff and the Class seek to level the playing field, enjoin NordSec's unlawful business practices, and recover the charges NordSec has imposed on Plaintiff and the Class in violation of the law.

## JURISDICTION AND VENUE

14.    This Court has personal jurisdiction over Defendants because they conduct substantial business in North Carolina, have sufficient minimum contacts with this state, and otherwise purposely avail themselves of the privileges of conducting business in North Carolina by marketing and selling products and services in North Carolina. Further, the injuries to North Carolina consumers that Plaintiff seeks to prevent through public injunctive relief arise directly from NordSec's continuing conduct in North Carolina, including, but not limited to, directing its auto-enrollment and renewal practices at North Carolina consumers.

15.    This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendants.

16.    This Court has original subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act.  However, if the Court determines that it lacks original jurisdiction over any claim in this action, it may exercise supplemental jurisdiction over Plaintiff's claims under 28 U.S.C. § 1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged improper conduct occurred within this District, as Plaintiff resides in this District, and Defendants reside in this District for venue purposes.  *Id.* § 1391(c)(2).

## PARTIES

18.    Plaintiff Dennis Hanscom is a citizen of North Carolina and lives in Charlotte, North Carolina.  He enrolled in a NordSec subscription on August 2, 2023.

19.    Plaintiff is a consumer who was victimized by NordSec's unlawful autorenewal practices, suffered injury in fact, and lost money because of NordSec's violations of North Carolina consumer protection statutes.

20.    Defendant NordSec Ltd. is an internet privacy and security company headquartered in Vilnius, Lithuania.

21.    Defendant NordSec B.V. is an internet privacy and security company headquartered in Vilnius, Lithuania.

22.    Defendant Nordvpn S.A. is a Panamanian corporation incorporated under the laws of Panama.  Nordvpn S.A.'s principal place of business is in Panama City, Panama.

23.    Defendant Nord Security Inc. is a Delaware corporation.

24.    Defendant Tefincom S.A. d/b/a NordVPN is a Panamanian corporation incorporated under the laws of Panama.  Tefincom S.A.'s principal place of business is PH F&F Tower, 50th Street and 56th Street, Suite #32-D, Floor 32, Panama City, Panama.  Defendant Tefincom S.A. owns and controls Defendants NordSec Ltd. and NordSec B.V. and owns the trademark for "NordVPN."

25.    Upon information and belief, with respect to all actions and decisions to this action, Defendants have operated as a single entity, "Nord Security."

26.    Defendants held themselves out to the public, including Plaintiff, as if each entity were operating as a single entity.

27.    Upon information and belief, at all times pertinent to this action, the finances, policies, and business practices of Defendants are and were dominated and controlled by one another in such a manner that each individual Defendant has no separate mind, will, identity, or existence of its own and instead operated as mere instrumentalities and alter egos of one another.

28.     Upon information and belief, Defendants are so closely related in ownership and management, and that each works closely in concert with the other, such that each has become the alter ego of the other, in that, among others:

    a.  Defendants operate and hold themselves out to the public as a single entity.

    b.  Defendants operate and hold themselves out to the public in such a way that members of the public would be unable to identify and distinguish between one entity and another.

29.     When Defendants issue news releases about NordSec's activities, they do so under the NordVPN brand and include contact information of various NordSec employees with nordsec.com email addresses.

30.     Any such conduct of one Defendant should be imputed to each other Defendant.

## **FACTUAL ALLEGATIONS**

### A.    **Background on the Subscription e-Commerce Industry**

31.     The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[1]  Subscription e-commerce services target a wide range of customers and cater to a variety of specific interests. Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[2]  According to the Washington Post, analysts at UBS predict that the

---

[1] *See* Sam Saltis, CORE DNA, How to Run an eCommerce Subscription Service: The Ultimate Guide, https://www.coredna.com/blogs/ecommerce-subscription-services.

[2] Mary Mesienzahl, BUSINESS INSIDER, Taco Bell's taco subscription is rolling out nationwide — here's how to get it, Jan. 6, 2022, https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[3]

32.    The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  "Over the past 11 years, subscription-based companies[] have grown 3.7x faster than the companies in the S&P 500."[4]

33.    The expansion of the subscription e-commerce market shows no signs of slowing. According to The Washington Post, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] . . . The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[5]

34.    However, there are downsides associated with the subscription-based business model.  While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[6]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[7]  Yet, retailers have also recognized that, where the recurring

---

[3] Heather Long and Andrew Van Dam, WASHINGTON POST, Everything's becoming a subscription, and the pandemic is partly to blame, June 1, 2021,
https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/.
[4] The Subscription Economy INDEX, ZUORA, Mar. 2023,
https://www.zuora.com/resources/subscription-economy-index/.
[5] Heather Long and Andrew Van Dam, *supra* note 3.
[6] McKinsey & Company, Thinking inside the subscription box: New research on e-commerce consumers, February 2018, https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[7] *Id.*

nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[8] As these companies have realized, "[t]he real money is in the inertia."[9] As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[10] That is, to facilitate consumer inertia, some subscription e-commerce companies, including Defendants, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this by intentionally confusing users with their app's design and flow, … and other misleading tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs.[11]

      35.    To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[12] Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[13] Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for

---

[8] Amrita Jayakumar, WASHINGTON POST, Little-box retailing: Subscription services offer new possibilities to consumers, major outlets, Apr. 7, 2014, https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[9] Id.

[10] Zoe Schiffer, BUSINESS INSIDER, A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want, June 25, 2019, https://www.businessinsider.com/dark-patterns-online- shopping-princeton-2019-6.

[11] Sarah Perez, TECHCRUNCH, Sneaky subscriptions are plaguing the App Store, Oct. 15, 2018, https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store.

[12] Heather Long and Andrew Van Dam, *supra* note 3 ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* NEW MEDIA AND MARKETING, The problem with subscription marketing, Mar. 17, 2019, https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing.

[13] Id.

companies to trap consumers into monthly subscriptions that drain their bank accounts [and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[14] widespread utilization of these misleading dark patterns and deliberate omissions persist.

36.    The term "dark patterns" in this Complaint is not a science fiction reference, but a term of art from the field of user experience ("UX").  The International Organization for Standardization (ISO) defines "user experience" as a "person's perceptions and responses that result from the use or anticipated use of a product, system or service."[15]  Dark patterns in UX are "carefully designed misleading interfaces by UX design experts that trick the users into choosing paths that they didn't probably want to take, thus fulfilling the business objectives, completely ignoring the requirements and ethics of users."[16]

37.    The term was first coined by cognitive scientist Harry Brignull, who borrowed from existing UX terminology.  In UX, designers refer to common, re-usable solutions to a problem as a "design pattern," and conversely to common mistakes to solutions as "anti-patterns."[17]  The term "dark patterns" was intended to "communicate the unscrupulous nature" of the design "and also

---

[14] *Id.*

[15] UIUX TREND, User Experience (UX): Process and Methodology, https://uiuxtrend.com/user-experience-uxprocess/.

[16] Joey Ricard, KLIZO SOLS. PVT. LTD., *UX Dark Patterns: The Dark Side Of The UX Design*, Nov. 9, 2020, https://klizos.com/ux-dark-patterns-the-dark-side-of-the-ux-design.

[17] Harry Brignull, MEDIUM, *Bringing Dark Patterns to Light*, June 6, 2021, https://harrybr.medium.com/bringing-dark-patterns-to-light-d86f24224ebf.

the fact that it can be shadowy and hard to pin down."[18]  The following image provides some examples of commonly employed dark patterns:[19]



38.    The origin of dark patterns can be traced to the use of applied psychology and A/B testing in UX.[20]  In the 1970s, behavioral science sought to understand irrational decisions and behaviors and discovered that cognitive biases guide all our thinking.  The following image

---

[18] *Id.*

[19] Sarbashish Basu, H2S MEDIA, *What is a dark pattern?  How it benefits businesses- Some examples*, Dec. 19, 2019, https://www.how2shout.com/technology/what-is-a-dark-pattern-how-it-benefit-businesses-with-some-examples.html.

[20] Brignull, *supra* note 17.

provides examples of cognitive biases, including some that Defendants employ in their cancellation process: [21]



39.    But while the early behavioral research focused on understanding rather than intervention, later researchers, like Cass Sunstein and Richard Thaler (authors of the book *Nudge*) shifted focus and made the policy argument that institutions should engineer "choice architectures" in a way that uses behavioral science for the benefit of those whom they serve.[22]

---

[21] Krisztina Szerovay, UX KNOWLEDGE BASE, *Cognitive Bias — Part 2*, Dec. 19, 2017, https://uxknowledgebase.com/cognitive-bias-part-2-fab5b7717179.
[22] Arvind Narayanan *et al*., *Dark Patterns: Past, Present, and Future. The evolution of tricky user interfaces*, 18 ACM QUEUE 67-91, 2002, https://queue.acm.org/detail.cfm?id=3400901.

40.     Another step in the development and application of such research is the use of A/B testing in UX.  A/B testing is a quantitative research method that presents an audience with two variations of a design and then measures which actions they take (or do not take) in response to each variant.[23]  UX designers use this method to determine which design or content performs best with the intended user base.[24]  For example, a large health care provider might A/B test whether a website visitor is more or less likely to conduct a search of its doctors if the website's search function is labelled "SEARCH" versus simply identified by a magnifying glass icon.

41.     Unscrupulous UX designers subverted the intent of the researchers who discovered cognitive biases by using these principles in ways that undermined consumers' autonomy and informed choice, and they used A/B testing to turn behavioral insights into strikingly effective user interfaces that deceived consumers in ways that were more profitable to the company applying them.[25]  Dark patterns increase a company's ability to extract revenue from its users by nudging or tricking consumers to spend more money than they otherwise would, hand over more personal information, or see more ads.[26]

42.     Defendants have engaged in these unlawful subscription practices with great success.  In 2022, NordSec raised $100 million from investors, with the company valued at $1.6 billion.[27]  NordSec's products and services have over 15 million users.

---

[23]    UXPin, *A/B Testing in UX Design: When and Why It's Worth It*, https://www.uxpin.com/studio/blog/abtesting-in-ux-design-when-and-why.
[24] *Id.*

[25] Narayanan *et al.*, *supra* note 22.
[26] *Id.*
[27] Ingrid Lunden, NordVPN raises its first money, $100M at a $1.6B valuation, TECHCRUNCH, Apr. 6, 2022, https://techcrunch.com/2022/04/06/nord-security-the-startup-behind-nordvpn-raises-its-first-ever-funding-100m-at-a-1-6b-valuation.

### B.    NordSec's Enrollment Process Violates the ARL

43.    Upon information and belief, the payment screen for NordSec's enrollment process that Plaintiff used in August 2023 was materially similar to NordSec's current payment page, as reproduced below:





44.    The fine print below the solid line that includes (insufficient) autorenewal disclosures is on NordSec's payment screen but is not visible unless the consumer scrolls down to view it.

45.    NordSec's payment page lacks the requisite disclosures and runs afoul of North Carolina law in several respects.

46.    NordSec's automatic renewal offer does not clearly and conspicuously disclose how to cancel the contract, in violation of the ARL.  N.C.G.S.A. § 75-41(a)(2).

47.     The terms and conditions of NordSec's automatic renewal offer are not presented to consumers "clearly and conspicuously," as required by the North Carolina ARL.  The automatic renewal language is not in larger type than the surrounding font, is colored light gray rather than a more conspicuous color, is not set off from the surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language.  N.C.G.S.A. § 75-41(a)(1) (requiring companies like NordSec to "[d]isclose the automatic renewal clause clearly and conspicuously").

48.     Instead, the overall design of the page, including the notice placement, font size, and color ***deemphasize*** the notice text rather than render it conspicuous.  The automatic renewal terms are not in visual connection with the purchase terms and are instead buried at the bottom of the page.  This makes it unlikely that consumers will even see the disclosures because they must scroll down to view them, and they are presented in a light grey font against a lighter gray background and in a single-spaced format, which makes the disclosures difficult to read.

49.     Moreover, any supposed "disclosures" on the NordSec payment page are far overshadowed by the page's other components in a clear demonstration of the "Misinformation" dark pattern.  The payment page uses at least 12 different colors, presents information in differently sized fonts and in various boxes, and includes hyperlinks, drop-down menus styled as hyperlinks, two call-outs for add-on products, and 13 different logos.  In contrast, the automatic renewal terms are hidden at the bottom of the page, difficult to discern and easy to miss unless consumers scroll down on the screen to view them.

50.     NordSec's "Order Summary" box likewise does not sufficiently present the terms and conditions of its automatic renewal offer to consumers, nor does it present the consumer with an easily accessible disclosure of the methods that the consumer may use to cancel the subscription.

51.     When consumers click on one of the various payment methods on NordSec's payment page, those expanded boxes also do not disclose NordSec's autorenewal terms, let alone do so in a clear and conspicuous manner, nor do they present the consumer with any disclosure of the methods that the consumer may use to cancel the subscription, let alone one that is easily accessible.

52.     The NordSec payment page also fails to obtain consumers' affirmative consent to the automatic renewal terms and contains no mechanism for affirmatively consenting to the automatic renewal terms.  For example, there is no checkbox that consumers must click to indicate that they accept those terms.

**C.     NordSec's Acknowledgement and Receipt Emails Violate the ARL**

53.     After Plaintiff enrolled in NordSec, NordSec sent Plaintiff an email with the subject line "Welcome to NordVPN!"  A representative version of the acknowledgement email sent to Plaintiff is shown on the following pages:

 NordVPN®

# Connect to NordVPN and encrypt your traffic

Reduce everyday online risks and make sure you browse the web safely. Connect now!



The world of privacy and security is at your fingertips.



**Connect Now**

Don't leave gaps in your security. Explore all features and benefits NordVPN has to offer.



**Protect all your devices**
You can use NordVPN on 6 devices at the same time. Find NordVPN apps for all devices here.



**Fend off cyber threats**
Block web trackers, ads, and malicious websites and files with the Threat Protection feature for desktop apps. Turn on.



**Check if your data hasn't leaked**
Scan the dark web for login details associated with your email address with Dark Web Monitor feature. Check now.

If you're in a country that restricts VPNs, click here.

Stay safe!
The NordVPN team



54.    After Plaintiff enrolled in NordSec, NordSec also sent Plaintiff an email containing the word "receipt" in the subject line.  A representative version of the receipt email sent to Plaintiff is shown on the following page:

 **Nord** Account

# Thank you for your purchase

Here are the details of your order.

| Item | Price |
|------|------:|
| NordVPN: 2-year subscription | $102.33/2 years |

Sales tax 8.875% - $9.08

Total: **$111.41/2 years**

**Payment method:** VISA ****0637
**Order date:** Dec 14, 2023 05:31:28 PM UTC

Find all the receipts at any time by logging into your <u>Nord Account</u>.

 NordVPN

**Get 3 free months for every friend you refer**
Share your unique referral link with as
many friends as you want!

**Start Referring**



Need help? Get in touch at <u>support@nordaccount.com</u>

55.     Neither the acknowledgement nor the receipt emails meet the post-purchase requirements that the ARLs impose on an automatically renewing product or service.  *See* N.C.G.S.A. § 75-41(a)(2).

56.     The acknowledgement and receipt emails violate the ARL because they do not disclose "clearly and conspicuously how to cancel the contract."  N.C.G.S.A. § 75-41(a)(2).

57.     In fact, neither of these emails include any disclosure whatsoever about how to cancel a NordSec account.

**D.     NordSec's Cancellation Process is Unfair and Deceptive**

58.     NordSec's cancellation process is not simple, cost-effective, timely, easy-to-use, nor readily accessible to consumers.  Instead, NordSec employs the "roach motel" dark pattern to get and keep consumers—and their payment methods—on its books:  it is easy to sign up for NordSec products and services, but hard to get out.

59.     NordSec buries its cancellation mechanism four layers deep in its customer account portal, with no clear path evident to the consumer for how to get there.  Canceling a NordSec subscription first requires consumers to (1) log into their customer account, and (2) select "Billing" from a list of at least nine options.  Once "Billing" is selected, the default view on the "Billing" page does not mention anything about cancellation, and instead shows the consumer's "Billing history."  Upon information and belief, NordSec's "Home" and "Billing" pages available to Plaintiff in approximately August 2023 were materially similar to NordSec's current Home and Billing pages copied on the following page:



60.      After navigating to NordSec's "Billing page," consumers wishing to cancel must then (3) know to navigate to the "Subscriptions" tab on the "Billing" page.  Once consumers access the "Subscriptions" tab, they are still not presented with a "Cancel" option.  Instead, consumers must then (4) understand that they need to click on "Manage" on a line pertaining to "Auto-renewal" to finally access a page where they can cancel their account.  Upon information and belief, NordSec's "Subscriptions" tab available to Plaintiff in approximately August 2023 was materially similar to the NordSec "Subscriptions" tab copied as the first image on the next page, as well as the page consumers view when they click "Manage" next to "Auto-renewal," in the second image on the next page:



61.     For consumers who manage to find and click "Cancel auto-renewal," the autorenewal is canceled.   But NordSec's multi-step cancellation process designed to resist cancellation efforts—a "roach motel" dark pattern—prevents consumers from finding and canceling autorenewal.  This is an unfair and deceptive trade practice that violates North Carolina's consumer protection statute.  *See* N.C.G.S.A. § 75-1.1(a).

**E.    How NordSec's North Carolina ARL Violations Injured Plaintiff**

62.     Plaintiff was injured by NordSec's North Carolina ARL violations in its enrollment process because had Plaintiff known that he was enrolling in an automatically renewing subscription, he would not have enrolled in a NordSec subscription.

63.     On approximately August 2, 2023 Plaintiff enrolled in a 30-day free trial of NordSec's VPN service, NordLocker, and NordPass.

64.     On August 2, 2023, Plaintiff received a receipt from NordSec for $83.76 for the VPN service, $24.00 for NordLocker, and $24 for NordPass, for a total of $131.76.

65.     After signing up for the trial period, Plaintiff downloaded the NordVPN app. Plaintiff accessed his NordSec offerings a few times during the trial period, but decided he did not want to continue with NordSec.

66.     On August 15, 2023, Plaintiff contacted NordSec customer service to cancel his NordSec subscriptions.  NordSec informed Plaintiff that he would not be charged unless he resubscribed to NordSec.

67.     Later on August 15, 2023, Plaintiff received an email from NordSec confirming that his automatic renewal was cancelled.

68.     Having decided not to subscribe to NordSec, and having communicated this to the Company, Plaintiff believed that once the trial period was over, he would no longer be a NordSec customer.  Indeed, Plaintiff never expected to pay NordSec because he canceled his NordSec subscriptions before the 30-day free trial ended.  NordSec did not adequately disclose to Plaintiff that it would automatically enroll him in its subscription programs and begin charging a non-refundable fee for a 2-year membership of $131.76 despite canceling his subscriptions during the trial period.

69.     On approximately September 28, 2023, Plaintiff saw on a third-party billing statement that NordSec had charged him for a recurring subscription in the amount of $131.76.

70.     When Plaintiff contacted NordSec customer service about the $131.76 payment, he was told that he had only canceled autorenewal for the renewal after the two-year subscription

expired and not the initial subscription, despite the free trial.  NordSec refused to provide Plaintiff a refund.

71.    NordSec did not "clearly and conspicuously" disclose to Plaintiff that the NordSec subscriptions would automatically renew after he canceled the free trial.  NordSec's automatic renewal clause was not included "clearly and conspicuously" in the contract or contract offer.  Nor did NordSec "clearly and conspicuously" disclose how to cancel Plaintiff NordSec subscriptions.

72.    Plaintiff did not authorize or want his NordSec subscriptions to renew.  In fact, Plaintiff canceled his subscriptions, but NordSec charged him anyway.

73.    Plaintiff was injured when NordSec extracted $131.76 from his payment accounts for NordSec subscriptions he did not want and did not authorize payment for.

74.    Plaintiff was further injured by NordSec's North Carolina ARL violations because had he known the truth of NordSec's misleading and intentionally difficult cancellation process, he would not have enrolled in NordSec subscriptions.

75.    Plaintiff intends to purchase products and services in the future for himself from internet security companies, including NordSec, as long as he can gain some confidence in NordSec's representations about its products and services and automatic enrollment, renewal, and cancellation practices.  Moreover, NordSec still has Plaintiff's payment information and could use it to process further unauthorized payments.

## CLASS ACTION ALLEGATIONS

76.    Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all NordSec customers in the United States who were subjected to Defendants' misleading subscription practices from the earliest allowable date through the date of judgment (the "Class").

77.     Plaintiff also brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all NordSec customers in the state of [*e.g.*, North Carolina] (including customers of companies NordSec acts as a successor to) who were automatically enrolled into and charged for at least one month of NordSec membership by Defendants at any time from [applicable statute of limitations period] to the date of judgment (the "Subclasses").

78.     As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants.  Defendants have engaged in uniform and standardized conduct toward the Class and this case is about the responsibility of Defendants, at law and in equity, for their knowledge and conduct in deceiving their customers.  Defendants' conduct did not meaningfully differ among individual Class Members in their degree of care or candor, their actions or inactions, or in their false and misleading statements or omissions.  The objective facts on these subjects are the same for all Class Members.

79.     Excluded from the Class are:  Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants.  Also excluded are federal, state and local government entities; and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

80.     Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add Subclasses, when Plaintiff files his motion for class certification.

81.     Plaintiff does not know the exact size of the Class since such information is in the exclusive control of Defendants.  Plaintiff believes, however, that the Class encompasses

thousands of consumers whose identities can be readily ascertained from NordSec's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

82.     The Class is ascertainable because its members can be readily identified using data and information kept by Defendants in the usual course of business and within their control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

83.     Plaintiff is an adequate class representative.  Plaintiff's claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by Defendants.  Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendants' conduct.

84.     Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Class.

85.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.   Whether Defendants' conduct violates the North Carolina ARL;

      b.   Whether Defendants' conduct violates the applicable North Carolina consumer protection statutes;

      c.   Whether Defendants were unjustly enriched as a result of their conduct;

      d.   Whether Class Members have been injured by Defendants' conduct;

      e.   Whether, and to what extent, equitable relief should be imposed on Defendants to prevent them from continuing their unlawful practices; and

      f.   The extent of class-wide injury and the measure of damages for those injuries.

86.    A class action is superior to all other available methods for resolving this controversy because (1) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; (2) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct; (3) Defendants have acted or refused to act on grounds generally applicable to all Class Members; and (4) questions of law and fact common to the Class predominate over any questions affecting only individual Class Members.

87.    Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

    a.    Whether Defendants' conduct violates the ARL;

    b.    Whether Defendants' conduct violates the applicable North Carolina consumer protection statutes;

    c.    Whether Defendants were unjustly enriched as a result of their conduct;

    d.    Whether Class Members have been injured by Defendants' conduct;

    e.    Whether, and to what extent, equitable relief should be imposed on Defendants to prevent them from continuing their unlawful practices; and

    f.    The extent of class-wide injury and the measure of damages for those injuries.

88.    Accordingly, this action satisfies the requirements set forth under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rule of Civil Procedure.

## COUNT I

**NORTH CAROLINA AUTOMATIC RENEWAL LAW (N.C.G.S. § 75-41, *et seq*.)**
**(ON BEHALF OF THE NORTH CAROLINA CLASS UNDER NORTH CAROLINA**
**LAW)**

89.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

90.    Plaintiff brings this claim on his own behalf and on behalf of each member of the

North Carolina Class.

91.    The North Carolina ARL requires that any person offering a contract that

"automatically renews unless the consumer cancels the contract" must disclose: (1) "the automatic

renewal clause clearly and conspicuously in the contract or contract offer," and (2) clearly and

conspicuously how to cancel the contract in the initial contract, contract offer, or with delivery of

products or services." N.C.G.S.A. §§ 75-41(a)(1)–(2). Defendants' failure to comply includes at

least the following independent violations:

      a.    NordSec failed to clearly and conspicuously disclose the automatic renewal
          clause in its subscription offer, as required by N.C.G.S.A. § 75-41(a)(1);
          and

      b.    NordSec failed to clearly and conspicuously disclose how to cancel the
          contract in the initial contract, contract offer, or with delivery of products
          or services, as required by N.C.G.S.A. § 75-41(a)(2).

92.    Defendants' violations of the North Carolina ARL "renders the automatic renewal

clause void and unenforceable." N.C.G.S.A. § 75-41(e).

93.    Defendants are not afforded any of the protections of N.C.G.S. §75-41(c) as, upon

information and belief, Defendants cannot demonstrate that it: (1) has established and implemented

written procedures to comply with N.C.G.S. §75-41 and enforces compliance with the procedures;

(2) any failure to comply with N.C.G.S. § 75-41 is the result of error; and (3) where an error has

caused the failure to comply with N.C.G.S. § 75-41, Defendants provide full refunds or credit for

all amounts billed or paid by Plaintiff and Class members from the date of the renewal until the

date of the termination of the contract, or the date of the subsequent notice of renewal, whichever occurs first.

94.    Plaintiff and the North Carolina Class Members suffered monetary damages as a result of Defendants' conduct.

95.    Defendants are liable to Plaintiff and the North Carolina Class Members for actual damages sustained.

## COUNT II

**NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C.G.S. § 75-1.1, *et seq.*)**
**(ON BEHALF OF THE NORTH CAROLINA CLASS AGAINST DEFENDANTS)**

96.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

97.    Plaintiff brings this claim on his own behalf and on behalf of each member of the North Carolina Class.

98.    North Carolina's Unfair and Deceptive Trade Practices Act, N.C.G.S.A. § 75-1.1, *et seq*. ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA.  N.C.G.S.A. § 75-16.

99.    Defendants engaged in unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, with respect to the sale and advertisement of the products and services purchased by Plaintiff and the North Carolina Class Members, in violation of N.C.G.S.A. § 75-1.1(a), including by making false representations or concealing the true risks of a NordSec subscription, and failing to engage in fair and upright business practices.

100.    The above unfair or deceptive acts or practices by Defendants were conducted in or affecting "commerce," as defined by N.C.G.S.A. § 75-1.1(b).

101.    The above unfair or deceptive acts or practices by Defendants were reasonably and intentionally calculated to deceive class members and other consumers.

102.    The above unfair or deceptive acts or practices by Defendants did in fact deceive class members and other consumers, causing them damage.

103.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

104.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the North Carolina Class Members.

105.    Plaintiff and the North Carolina Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of NordSec's products and services had they known the truth about the risks of subscribing to NordSec.

106.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and the North Carolina Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

107.    Plaintiff and the North Carolina Class Members seek relief under N.C.G.S.A. §§ 75-16 and 75-16.1, including, but not limited to injunctive relief, damages, treble damages, and attorneys' fees and costs.

## COUNT III

## CONVERSION

## (ON BEHALF OF A MULTISTATE CLASS UNDER NORTH CAROLINA LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANTS DO BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)

108.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

109.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Multistate Class under North Carolina law or under the laws of each of the states where Defendants do business that permit an independent cause of action for conversion, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

110.    In all states where Defendants do business, there is no material difference in the law of conversion as applied to the claims and questions in this case.

111.    Plaintiff and the Class own and have a right to possess the money that is in their respective bank accounts, internet payment accounts, and/or credit cards.

112.    Defendants substantially interfered with Plaintiff and the Class's possession of this money by knowingly and intentionally making unauthorized charges to their bank accounts, internet payment accounts, and/or credit cards for NordSec subscriptions.

113.    Plaintiff and the Class never consented to Defendants taking of this money from their bank accounts, internet payment accounts, and/or credit cards.

114.    Defendants wrongfully retained dominion over this monetary property and/or the time-value of the monetary property.

115.    Plaintiff and the Class have been damaged by Defendants' wrongful taking of such money from their bank accounts, internet payment accounts, and/or credit cards in an amount that is capable of identification through Defendants' records.

116.    By reason of the foregoing, Defendants are liable to Plaintiff and the Class for conversion in an amount to be proved at trial.

## COUNT IV

### UNJUST ENRICHMENT

### (ON BEHALF OF A MULTISTATE CLASS UNDER NORTH CAROLINA LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANTS DO BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)

117.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

118.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Multistate Class under North Carolina law or the laws of each of the states where Defendants do business that permit an independent cause of action for unjust enrichment, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

119.    In all states where Defendants do business, there is no material difference in the law of unjust enrichment as applied to the claims and questions in this case.

120.    As a result of their unjust conduct, Defendants have been unjustly enriched.

121.    By reason of Defendants' wrongful conduct, Defendants have benefited from receipt of improper funds, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

122.    As a result of Defendants' conduct it would be unjust and/or inequitable for Defendants to retain the benefits of its conduct without restitution to Plaintiff and the Class. Accordingly, Defendants must account to Plaintiff and the Class for their unjust enrichment.

## COUNT V

## NEGLIGENT MISREPRESENTATION

## (ON BEHALF OF A MULTISTATE CLASS UNDER NORTH CAROLINA LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANTS DO BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)

123.    Plaintiff incorporates by reference all preceding and subsequent paragraphs..

124.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Multistate Class under North Carolina law or the laws of each of the states where Defendants do business that permit an independent cause of action for negligent misrepresentation, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

125.    In all states where Defendants do business, there is no material difference in the law of negligent misrepresentation as applied to the claims and questions in this case.

126.    Defendants failed to disclose material facts concerning their subscription practices including:

    a.  NordSec failed to clearly and conspicuously disclose the automatic renewal clause in its subscription offer, as required by N.C.G.S.A. § 75-41(a)(1); and

    b.  NordSec failed to clearly and conspicuously disclose how to cancel the contract in the initial contract, contract offer, or with delivery of products or services, as required by N.C.G.S.A. § 75-41(a)(2).

127.    Defendants had a legal duty to provide disclosures regarding NordSec's automatic renewal clause as required by N.C.G.S.A. § 75-41(a)(1).  Further, Defendants had a duty to clearly and conspicuously disclose to customers how to cancel the contract in the initial contract, contract offer, or with delivery of products or services, as required by N.C.G.S.A. § 75-41(a)(2).

128.    Defendants sold Plaintiff and the Class NordSec subscriptions without making the disclosures required by law.

129.    Defendants' failure to disclose these material facts led Plaintiff and the Class to incorrectly believe that their NordSec subscriptions would not be recurring charges.

130.    Defendants had a duty to disclose the material information they concealed as to the NordSec subscription and cancelation process charge because the information was known and accessible only to Defendants, Defendants had superior knowledge and access to the facts, Defendants authored the web pages and emails containing the inadequate disclosures, and Defendants knew the facts were not known to or reasonably discoverable by Plaintiff and the Class.

131.    Plaintiff was unaware of these material facts and would not have agreed to enroll in a NordSec subscription if he had known these concealed and/or suppressed facts.

132.    Defendants understand that customers like Plaintiff and the Class desire accurate and truthful information in online contracts for a serious purpose, namely, accurately managing their personal finances.

133.    Plaintiff and the Class reasonably relied on Defendants' omissions.

134.    Defendants' negligent misrepresentation caused damage to Plaintiff and the Class, who are entitled to damages and other legal and equitable relief as a result.

135.    Therefore, Defendants are liable to Plaintiff and Class Members for the damages that they have suffered as a result of Defendants' actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)     Issue an order certifying the Classes defined above, appointing the Plaintiff as Class representative, and designating Milberg Coleman Bryson Phillips Grossman, PLLC and Wittels McInturff Palikovic as Class Counsel;

(b)     Find that Defendants have committed the violations of law alleged herein;

(c)     Determine that Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate order awarding restitution and

monetary damages to the Nationwide Class or, alternatively, the State Classes;

(d)     Enter an order granting all appropriate relief including injunctive relief on behalf of the State Classes under the applicable state laws;

(e)     Render an award of compensatory damages of at least $100,000,000, the exact amount of which is to be determined at trial;

(f)     Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

(g)     Declare that Defendants have committed the violations of law alleged herein;

(h)     Render an award of punitive damages;

(i)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(j)     Grant all such other relief as the Court deems appropriate.

Dated:  March 5, 2024.

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

s/ Scott C. Harris
Scott C. Harris
N.C. Bar No.: 35328
Kathryn Anne B. Robinson
N.C. Bar No.: 61092
J. Hunter Bryson
N.C. Bar No.: 50602
900 W. MORGAN STREET
RALEIGH, NORTH CAROLINA 27603
Tel:    919-600-5000
Fax:    919-600-5035
sharris@milberg.com
krobinson@milberg.com
hbryson@milberg.com


**WITTELS MCINTURFF PALIKOVIC**

J. Burkett McInturff*
Ethan D. Roman*
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jbm@wittelslaw.com
edr@wittelslaw.com

*Co-Counsel for Plaintiff and the Proposed Class*

*** Motion for pro hac vice admission forthcoming*